### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE STATE OF LOUISIANA, THROUGH THE COASTAL PROTECTION AND RESTORATION AUTHORITY BOARD AND THE COASTAL PROTECTION AND RESTORATION AUTHORITY | CIVIL ACTION |
| VERSUS | No. 14-2467 |
| UNITED STATES ARMY CORPS OF ENGINEERS ET AL. | SECTION I |

### ORDER AND REASONS

Before the Court are cross-motions[1] for summary judgment filed by plaintiff, the State of Louisiana, acting through the Coastal Protection and Restoration Authority (the "CPRA") and the CPRA Board, and by defendants, the U.S. Army Corps of Engineers (the "Corps") and several of its officers. For the following reasons, it is ordered that plaintiff's motion for summary judgment is **GRANTED** and that defendants' motion for summary judgment is **DENIED**.

### BACKGROUND

"In 1943, Congress requested a report from the Chief of Engineers, Secretary of the Army, investigating ways to make the Port of New Orleans more accessible for maritime and military use." *In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 441 (5th Cir. 2012). Pursuant to that request, the Corps planned, and Congress authorized, construction of the Mississippi River-Gulf Outlet Canal ("MRGO"), which was "built to its full dimensions by 1968" and measured 36-38 feet deep and 500-600 feet wide. *Id.* "MRGO was cut through virgin coastal wetlands." *Id.* at 441-42. "The channel's original designers considered and rejected armoring its

---

[1] R. Doc. Nos. 24, 25.

banks with foreshore protection, leaving them vulnerable to erosion." *Id.* at 442. In a 1988 report, "[t]he Corps refused to undertake the cost of foreshore protection unless there was local cost participation under the Water Resources Development Act, 33 U.S.C. § 2201 *et seq.*" *Id.*

"Finally, in the mid-1990s, the Corps realized that the actual costs of maintaining the foreshore protection were less than estimated in the 1988 report," so "Congress instructed the Corps to use its available operations and maintenance funds to protect the shore to minimize future dredging costs and preserve the wetlands." *Id.* at 443. However, the damage had already been done. "The Corps' delay in armoring MRGO allowed wave wash from ships' wakes to erode the channel considerably," and "MRGO eventually reached a total average width of 1970 feet, well over three times its authorized width." *Id.* at 443 & n.1. "The increased channel width added more fetch[2] as well, allowing for a more forceful frontal wave attack on the levee[s]. MRGO's expansion thus allowed Hurricane Katrina to generate a peak storm surge capable of breaching" levees. *Id.* at 443. "Separately from MRGO, the hurricane also caused the 17th Street, Orleans Avenue, and London Avenue levees to breach." *Id.* Tragedy followed.

After Hurricane Katrina, Congress appropriated billions of dollars for the Gulf Coast's recovery. On December 30, 2005, Congress passed the "Department of Defense Emergency Supplemental Appropriations To Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, 2006," P.L. 109-148, 119 Stat. 2680 (referred to in this litigation as the "3rd Supplemental"). The 3rd Supplemental appropriated $327,517,000 to the Corps for operation and maintenance activities, including an earmark providing "[t]hat $75,000,000 of this amount shall be used for authorized operation and maintenance activities along [MRGO]." *Id.* div. B, tit. I, ch.

---

[2] "Fetch is defined as the width of open water that wind can act upon. The height of waves (such as the storm surge created by Katrina) is a function of the depth of the water as well as the width of the expanse (i.e., the fetch) over which wind impacts the water." *In re Katrina*, 696 F.3d at 443 n.2.

3. The 3rd Supplemental also appropriated $2,277,965,000 "for emergency response to and recovery from coastal storm damages and flooding related to the consequences of hurricanes in the Gulf of Mexico and the Atlantic Ocean," and Congress directed the Corps "to restore the flood damage reduction and hurricane and storm damage reduction projects, and related works, . . . at full Federal expense." *Id.* The 3rd Supplemental also included an earmark providing "[t]hat $544,460,000 of this amount shall be used to accelerate completion of unconstructed portions of authorized hurricane, storm damage reduction and flood control projects in the greater New Orleans and south Louisiana area at full Federal expense." *Id.*

On June 15, 2006, Congress passed the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006," P.L. 109-234, 120 Stat. 418 (referred to in this litigation as the "4th Supplemental"), which appropriated certain funds under four separate headings as follows.

Under the heading of "Investigations," Congress appropriated $3,300,000 for the Corps to "develop a comprehensive plan, at full Federal expense, to deauthorize deep draft navigation on [MRGO]," and it set deadlines for the Corps to submit a report outlining such plan. *Id.* tit. II, ch. 3.

Under the heading of "Construction," Congress appropriated $549,400,000 "for necessary expenses related to the consequences of Hurricane Katrina and other hurricanes of the 2005 season," including an earmark of $20,200,000 "to reduce the risk of storm damage to the greater New Orleans metropolitan area, at full Federal expense, by restoring the surrounding wetlands through measures to begin to reverse wetland losses in areas affected by navigation, oil and gas, and other channels and through modification of the Caernarvon Freshwater Diversion structure." *Id.* Congress also earmarked $495,300,000 to raise certain levee heights "consistent

with the cost-sharing provisions under which the projects were originally constructed," and it appropriated certain funds for three projects in other states. *Id.*

Under the heading of "Operations and Maintenance," Congress appropriated $3,200,000 for "dredg[ing] navigation channels and repair[ing] other Corps projects related to the consequences of Hurricane Katrina and other hurricanes of the 2005 season." *Id.*

Under the heading of "Flood Control and Coastal Emergencies," Congress appropriated $3,145,024,000 "to modify, at full Federal expense, authorized projects in southeast Louisiana to provide hurricane and storm damage reduction and flood damage reduction in the greater New Orleans and surrounding areas." *Id.* Certain portions of this $3 billion appropriation were earmarked for various projects, but the 4th Supplemental required that no work could begin on any of those projects until "non-Federal interests ha[d] entered into binding agreements with the [Corps] requiring the non-Federal interests to pay 100 percent of the operation, maintenance, repair, replacement, and rehabilitation costs of the project." *Id.*

Finally, the 4th Supplemental also amended the 3rd Supplemental to provide that the $75,000,000 which had been earmarked for operations and maintenance along MRGO "shall be used for the repair, construction or provision of measures or structures necessary to protect, restore or increase wetlands, [and] to prevent saltwater intrusion or storm surge." *Id.* tit. II, ch. 3, § 2304.

On November 8, 2007, Congress overrode President Bush's veto[3] and enacted the "Water Resources Development Act of 2007," P.L. 110-114, 121 Stat. 1041 ("WRDA 2007"). WRDA

---

[3] Although WRDA 2007 passed through Congress with substantial bipartisan support, President Bush vetoed the legislation, explaining in part: "This bill lacks fiscal discipline. . . . This bill does not set priorities. The authorization and funding of Federal water resources projects should be focused on those projects with the greatest merit that are also a Federal responsibility. . . . This bill promises hundreds of earmarks and hinders the Corps' ability to fulfill the Nation's

2007 was not an appropriations bill but, rather, an authorization for the Corps to pursue hundreds

of infrastructure projects around the country, including the closure of MRGO.[4] Congress directed

the Corps to submit to Congress "a final report on the deauthorization of [MRGO]" that was to

include, among other things, a plan to close MRGO and "a plan to restore natural features of the

ecosystem that will reduce or prevent damage from storm surge." *Id.* § 7013(a)(3)(A)-(B)(ii).

Congress also directed the Corps to "carry out a plan to close [MRGO] and restore and protect

the ecosystem substantially in accordance with the plan required [above], if the [Corps]

determines that the project is cost-effective, environmentally acceptable, and technically

feasible." *Id.* § 7013(a)(4). Congress mandated that upon submission of the Corps' report,

MRGO would be deauthorized. *Id.* § 7013(a)(1). Regarding the cost sharing for MRGO and

---

critical water resources needs -- including hurricane protection for greater New Orleans . . . ."
President Bush Vetoes Water Development Act of 2007, 2007 WL 3231250 (Nov. 2, 2007).

[4] This point was repeatedly emphasized during floor debate in both houses of Congress, and
WRDA 2007 begins with the description: "An Act To provide for the conservation and
development of water and related resources, to *authorize* the Secretary of the Army to construct
various projects for improvements to rivers and harbors of the United States, and for other
purposes." (emphasis added). *See also* WRDA 2007 § 7012(b) ("Activities *authorized* by
subsection (a) and section 7013 . . . .") (emphasis added); R. Doc. No. 24-1, at 6 ("[S]ection 7013
*provided authorization* for the Corps to implement an ecosystem restoration project in
accordance with the 7013(a)(3) plan if the Secretary determines that the ecosystem-restoration
project is cost-effective, environmentally acceptable, and technically feasible.") (emphasis
added); R. Doc. No. 25-2, at 26 ("The above *authorization* [in WRDA 2007 § 7013(a)(4)] is
important as it is a deviation from the standard congressional practice of requiring a separate
enactment to authorize the [Corps] to construct a project, and makes the project self-*authorizing*,
following the submission of a feasibility report.") (emphasis added).

   The distinction between authorization bills and appropriations bills is a crucial one.
"Congress has established a process that provides for two separate types of measures—
authorization measures and appropriation measures. These measures perform different functions.
Authorization acts establish, continue, or modify agencies or programs. . . . Appropriations
measures provide new budget authority for programs, activities, or agencies previously
authorized. Congress is not required to provide appropriations for an authorized discretionary
spending program." Jessica Tollestrup, Cong. Research Serv., RL 42388, The Congressional
Appropriations Process: An Introduction 10-11 (2014), *available at*
http://www.senate.gov/CRSReports/crs-publish.cfm?pid=%260BL%2BP%3C%3B3%0A (last
accessed August 27, 2015).

other projects, WRDA 2007 states: "(b) COST SHARING.—Activities authorized by [section 7012(a)] and section 7013 shall be carried out in a manner that is consistent with the cost-sharing requirements specified in the [4th Supplemental]." *Id.* § 7012(b).

On June 5, 2008, the Corps submitted the required § 7013(a)(3) report to Congress.[5] Such report provided that the Corps would construct a rock closure to prevent navigation of MRGO,[6] and it further provided that the federal government would pay all costs of construction for the closure, but that the non-federal sponsor (that is, plaintiff) was to provide all real estate acquisitions and maintain the closure structure at no cost to the federal government.[7] Although plaintiff disputed that it was responsible for any of the costs of the deauthorization,[8] on October 31, 2008, the parties entered into a memorandum of agreement ("MOA") in which plaintiff agreed to pay all such disputed costs "voluntarily" and "without prejudice."[9] The closure of MRGO was substantially completed in July 2009.[10]

The Corps' June 5, 2008 report did not provide a plan for the ecosystem restoration that was mandated by WRDA 2007 § 7013(a)(3)(B). The Corps stated it would address the ecosystem restoration plan at a later date in a supplemental report.[11] Such supplemental report was submitted on September 28, 2012.[12] The supplemental report estimated the total cost of the ecosystem restoration project to be approximately $2.9 billion,[13] and it provided that the project

---

[5] R. Doc. No. 24-2, ¶ 1; R. Doc. No. 35-2, ¶ 1. The report was based on a January 29, 2008 letter by R.L. Van Antwerp, Lieutenant General, U.S. Army, Chief of Engineers. *See* Administrative Record ("AR") 2432.

[6] R. Doc. No. 24-2, ¶ 3; R. Doc. No. 35-2, ¶ 3; AR 2428.

[7] R. Doc. No. 24-2, ¶ 4; R. Doc. No. 35-2, ¶ 4; AR 2428-2431.

[8] R. Doc. No. 24-2, ¶ 9; R. Doc. No. 35-2, ¶ 9; *see also, e.g.*, AR 2730.

[9] *See* R. Doc. No. 24-2, ¶¶ 9-14; R. Doc. No. 35-2, ¶¶ 9-14; AR 2743.

[10] R. Doc. No. 24-2, ¶ 15; R. Doc. No. 35-2, ¶ 15.

[11] R. Doc. No. 24-2, ¶ 16; R. Doc. No. 35-2, ¶ 16; AR 2427-2428.

[12] R. Doc. No. 25-1, ¶ 11; R. Doc. No. 34-1, ¶ 11; AR 1777-1791.

[13] R. Doc. No. 25-1, ¶ 24; R. Doc. No. 34-1, ¶ 24; AR 1779.

should be subject to a cost-sharing arrangement that required the federal government to pay 65% of the cost and the non-federal sponsor to pay 35% of the cost, i.e., approximately $975 million.[14] Because plaintiff objected to this cost-sharing requirement, the supplemental report concluded that there was not a non-federal sponsor for the ecosystem restoration,[15] and the Corps recommended that such project move forward only if a non-federal sponsor agreed to take on that cost-share.[16]

Plaintiff filed the complaint in the above-captioned matter on October 28, 2014, challenging the Corps' actions and the supplemental report as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law pursuant to the Administrative Procedure Act ("APA").[17] Plaintiff seeks an order by this Court vacating defendants' decision to require the State to provide any funding toward the MRGO closure and ecosystem restoration project.[18] The parties fully briefed this matter on cross-motions for summary judgment.[19]

---

[14] R. Doc. No. 25-1, ¶ 25; R. Doc. No. 34-1, ¶ 25; AR 1779-1780.

[15] *See* R. Doc. No. 25-1, ¶ 26; R. Doc. No. 34-1, ¶ 26; AR 1780.

[16] R. Doc. No. 25-1, ¶ 31; R. Doc. No. 34-1, ¶ 31; AR 1777-1791, 1797, 1799-1811.

[17] R. Doc. No. 1.

[18] R. Doc. No. 25-3.

[19] On April 1, 2015, the Court established the briefing schedule at a status conference attended by counsel. R. Doc. No. 19. On June 26, 2015, nearly three months after the status conference and less than four weeks before the filing deadline for the motions for summary judgment, the parties filed a joint motion to continue the briefing schedule regarding such motions in order to allow for additional time to supplement the administrative record. R. Doc. No. 20. On July 1, 2015, the Court denied the parties' motion due to a lack of good cause. R. Doc. No. 21.

The Court also notes that despite filing another motion to "supplement the administrative record," R. Doc. No. 33, plaintiff still has not adequately explained how or why the administrative record is allegedly incomplete, despite the fact that the complaint was filed on October 28, 2014, and despite the fact that the parties have been engaged in this dispute for years and could not have been surprised by the fact that it would proceed to litigation. Moreover, the Court notes that other than the emails referred to in plaintiff's latest motion, plaintiff has neither proffered any other materials, nor given the Court any indication of the nature of any other materials allegedly absent from the administrative record. Plaintiff has merely speculated that the administrative record is lacking, and nothing that plaintiff has produced casts any aspersions on

## STANDARD OF LAW

Judicial review of agency action is governed by the APA, 5 U.S.C. § 500 *et seq.* The APA provides that final agency actions are appealable to a U.S. District Court for review. *See id.* § 704. "The [APA] allows a federal court to overturn an agency's ruling 'only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole.'" *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011) (quoting *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010)).

"An executive branch agency's interpretations of the statutes that it is authorized to administer may be entitled to the deference" pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Dhuka v. Holder*, 716 F.3d 149, 154 (5th Cir. 2013). "*Chevron* is rooted in a background presumption of congressional intent: namely, 'that Congress, when it left ambiguity in a statute' administered by an agency, 'understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'" *City of Arlington, Texas v. FCC*, 133 S. Ct. 1863, 1868 (2013) (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-41 (1996)). "*Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency. Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *Id.* (citation omitted).

---

the Corps' assertion that it "has produced the complete Administrative Record that evidences its decision-making with regard to the cost-sharing" issue. R. Doc. No. 40, at 2.

*Chevron* sets forth a two-step framework. First, the Court must determine whether the statute at issue is ambiguous. *Khalid v. Holder*, 655 F.3d 363, 366 (5th Cir. 2011) (citing *Chevron*, 467 U.S. at 842-43), *abrogated on other grounds by Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191 (2014). "'If the intent of Congress is clear,'—that is, the statute is unambiguous with respect to the question presented—'the court, as well was the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *Chevron*, 467 U.S. at 842-43). "To determine whether a statute is ambiguous, [courts] employ the traditional tools of statutory construction," beginning with the "the plain language of the statute" while also reviewing "the broader context of the statute as a whole." *Id.* at 366-67 (internal citations and quotation marks omitted).

If the Court determines at step one that the statute at issue is ambiguous, "the analysis proceeds to *Chevron* step two, which asks 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* at 367 (quoting *Chevron*, 467 U.S. at 843). In order to determine whether an agency's construction of the statute is permissible, the Court should "consider 'only whether the decision is arbitrary, capricious, or manifestly contrary' to the statute, and [the Court] may not substitute [its] own judgment 'for a reasonable alternative formulated by the [agency].'" *Id.* (quoting *Mortera-Cruz v. Gonzales*, 409 F.3d 246, 253 (5th Cir. 2005)). In other words, as long as "the [decision of the agency] is based on a permissible construction of the statute," the Court will uphold it under the second step of *Chevron. Mortera-Cruz*, 409 F.3d at 253 (internal quotation marks omitted). Consequently, when a court "find[s] ambiguity as to Congress's intent, review of the agency's construction will be highly deferential." *Khalid*, 655 F.3d at 367.

**DISCUSSION**

First, the Court addresses defendants' assertion of a statute-of-limitations defense with respect to the closure component of the MRGO closure and ecosystem restoration project that was authorized by § 7013. Second, the Court addresses Congress's intent regarding cost sharing.

## I.        Statute of Limitations

As stated, the June 5, 2008 report to Congress provided that the federal government would pay all costs of construction for the closure, but that the non-federal sponsor (that is, plaintiff) was to provide all real estate acquisitions and maintain the closure structure at no cost to the federal government.[20] Defendants assert that any challenge with respect to that decision is barred by the six-year statute of limitations contained in 28 U.S.C. § 2401.[21] "Under this statute, a party challenging final agency action must commence his suit within six years after the right of action accrues and the right of action first accrues on the date of the final agency action." *Hardin v. Jackson*, 625 F.3d 739, 743 (D.C. Cir. 2010) (internal quotation marks omitted).

Defendants contend that no later than the transmission of the June 5, 2008 report to Congress, the Corps had taken its final agency action.[22] Plaintiff contends that the June 5, 2008 report was incomplete and, therefore, the final agency action was not taken "until, at the earliest,

---

[20] R. Doc. No. 24-2, ¶ 4; R. Doc. No. 35-2, ¶ 4; AR 2428-2431.

[21] R. Doc. No. 24-1, at 13-14. Section 2401 states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

[22] R. Doc. No. 24-1, at 14. Despite plaintiff's apparent confusion as to the nature of the Corps' defense, *see* R. Doc. No. 35, at 21 ("There are several reasons why 28 U.S.C. § 2401(a) and laches are inapplicable to this matter. And although any attempt to apply laches is incorrect in this matter, it is important to note that the [Corps] has not alleged that the entirety of the State's case is time-barred."), the briefing is clear that defendants assert a statute-of-limitations defense (not a laches argument) solely against plaintiff's challenge to their decisions regarding the closure structure. *E.g.*, R. Doc. No. 37, at 6 ("Plaintiffs claim that the Defendants raised the equitable defense of laches. . . . We did not. Instead, we argued in our opening motion that Plaintiffs brought their claim concerning cost-sharing for the closure structure beyond the applicable statute of limitations under 28 USC 2401(a).").

the transmission of the Supplemental Report to Congress on September 28, 2012."[23] Plaintiff argues in the alternative that "any and all obligations related to the closure portion of the MRGO deauthorization relate back to the consummation of the MOA on October 31, 2008, which memorialized the [Corps'] intention to effectuate various rights and obligations between the [Corps] and the State, over objection."[24]

"As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *see also Belle Co. v. U.S. Army Corps of Eng'rs*, 761 F.3d 383, 388-90 (5th Cir. 2014); *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011). "On the other hand, the Supreme Court has defined a nonfinal agency order as one that 'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'" *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)). "In evaluating whether a challenged agency action meets these two conditions, this court is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Belle Co.*, 761 F.3d at 388 (quoting *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011)). The Court finds that the June 5, 2008 transmission of the report to Congress (or the January 29, 2008 letter on which such report was based) was not a final agency action.

---

[23] R. Doc. No. 35, at 22.
[24] R. Doc. No. 35, at 24.

The Court finds that the first *Bennett* condition is met by the June 5, 2008 report. Such report was obviously a definitive statement of the agency's position regarding the real estate and ongoing maintenance obligations.[25] Such report also provided that the CPRA "will be the non-Federal sponsor for the implementation of the closure structure."[26] The Corps had clearly made its decision as to what the cost-sharing arrangement would be and who should be responsible for the non-federal share.

Regarding the second *Bennett* condition, however, the report stated that its closure plan and recommendation was "*subject to* the non-Federal sponsor executing an agreement with the Department of the Army prior to the Federal Government initiating construction of the closure structure and agreeing to comply with all applicable Federal laws and policies."[27] Elsewhere, the report states that the closure plan "would be implemented at Federal expense as part of the recommended plan *conditioned on* CPRA, the non-Federal sponsor, assuming responsibility at 100 percent non-Federal expense" for ongoing maintenance costs.[28] Because any action on the closure project was expressly conditioned on plaintiff executing an agreement with the Corps, no "legal consequences" could "flow" from the report, *Bennett*, 520 U.S. at 178, and the report "d[id] not itself adversely affect" the CPRA. *Am. Airlines*, 176 F.3d at 288. Rather, the mere issuance of the report to Congress did not bind the CPRA to pay anything for the closure project and, therefore, the report "only affect[ed] [plaintiff's] rights adversely on the contingency of future administrative action," i.e., the execution of the MOA. *Id.* After the execution of the MOA, however, the CPRA's "rights or obligations ha[d] been determined," and the MOA was the document from which "legal consequences will flow." *Bennett*, 520 U.S. at 178.

---

[25] *E.g.*, AR 2428, ¶ 5.
[26] AR 2428, ¶ 5.
[27] AR 2429, ¶ 10 (emphasis added).
[28] AR 2429, ¶ 7 (emphasis added).

Because the second *Bennett* condition was not satisfied by the June 5, 2008 report, the transmission of the report could not have been a "final agency action" for the purpose of the accrual of plaintiff's cause of action. The earliest possible final agency action was the October 31, 2008 execution of the MOA and, therefore, the earliest possible date for the accrual of plaintiff's cause of action was within the six-year statute of limitations. Accordingly, the Court need not address plaintiff's assertion with respect to the September 28, 2012 supplemental report, and defendants' argument with respect to the statute of limitations is without merit.[29]

## II.    Cost Sharing

The parties agree,[30] and the Court finds, that the Corps' actions should be evaluated pursuant to the well-established and above-described *Chevron* framework. Pursuant to *Chevron*, the first inquiry is whether the statute is ambiguous. "We determine whether a statute is ambiguous based in part on 'the text itself, its history, and its purpose.'" *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 269 (5th Cir. 2015). "Canons of statutory interpretation further assist us in assessing the meaning of a statute," and "'text, legislative history, and structure' are traditional tools of statutory interpretation." *Id.* (quoting *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)). For the following reasons, the Court finds that WRDA 2007, read in conjunction with the 4th Supplemental, unambiguously requires the Corps to complete the MRGO closure and ecosystem restoration project at full federal expense.

---

[29] In connection with the issue of the finality of the Corps' action, the parties cite and discuss the four factors identified in *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283 (5th Cir. 1997), a case that was decided approximately two months after *Bennett*. *See* R. Doc. No. 24-1, at 13; R. Doc. No. 35, at 21. Recent Fifth Circuit jurisprudence regarding this issue has focused solely on the *Bennett* conditions, *e.g.*, *Belle Co.*, 757 F.3d at 388-90; *Nat'l Pork Producers*, 635 F.3d at 755, and the Court is not aware of other Fifth Circuit cases that have applied *Dunn* in this context. Accordingly, this order and reasons confines its analysis to the *Bennett* conditions.

[30] *See, e.g.*, R. Doc. No. 24-1, at 10-11; R. Doc. No. 25-2, at 18-19.

As noted above, WRDA 2007 states: "(b) COST SHARING.—Activities authorized by [section 7012(a)] and section 7013 shall be carried out in a manner that is consistent with the cost-sharing requirements specified in the [4th Supplemental]." *Id.* § 7012(b). Section 7012(a) describes nine different projects which are also mentioned in the 4th Supplemental. Section 7013(a)(1) mandates the deauthorization of MRGO, and § 7013(a)(3) directs the Corps to develop the MRGO closure and ecosystem restoration plan. Section 7013(a)(4) directs the Corps to begin acting immediately: "(4) CONSTRUCTION.—The [Corps] shall carry out a plan to close [MRGO] and restore and protect the ecosystem substantially in accordance with the plan required under [§ 7013(a)(3)], if the Secretary determines that the project is cost-effective, environmentally acceptable, and technically feasible."

The 4th Supplemental, tit. II, ch. 3, appropriates funds for a number of different projects spread out under four different categories: "Investigations," "Construction," "Operations and Maintenance," and "Flood Control and Coastal Emergencies." The projects that are authorized by WRDA 2007 § 7012(a) are all listed in the "Flood Control and Coastal Emergencies" category, and the 4th Supplemental provides that such projects should be undertaken "at full Federal expense," but with "the non-Federal interests to pay 100 percent of the" ongoing maintenance costs.

Unlike the § 7012(a) projects, the MRGO closure and ecosystem restoration project authorized by § 7013 is not detailed in the 4th Supplemental. Although the 4th Supplemental directs the Corps to begin developing a comprehensive plan to deauthorize MRGO under the "Investigations" category, it is silent as to how such project would ultimately be funded. Defendants stop their analysis here, contending that "Congress did not provide specific direction for how the different kinds of cost-sharing in the [4th Supplemental] would apply to the activities

14

listed in section 7013."[31] Defendants then proceed to justify their conclusions by referring to the generally applicable cost-sharing statutes.[32]

What defendants ignore is § 7013(a)(4)'s characterization of Congress's directive to carry out the MRGO closure and ecosystem restoration project as "CONSTRUCTION." *Cf. United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) ("[W]ords in statutes should not be discarded as 'meaningless' and 'surplusage' when Congress specifically and expressly included them . . . ."). Congress did not specify that the Corps should use the generally applicable cost-sharing rules for ecosystem restoration projects, nor did Congress remain silent on the subject of cost sharing; rather, Congress described the MRGO closure and ecosystem restoration project as a "CONSTRUCTION" project, and then referred the Corps to the 4th Supplemental for guidance as to the cost-sharing allocation.

As noted, the 4th Supplemental allocates more than $549 million to "Construction" projects. Specifically, the 4th Supplemental, tit. II, ch. 3: (1) earmarked "up to $20,200,000 [which] may be used to reduce the risk of storm damage to the greater New Orleans metropolitan area, at full Federal expense, by restoring the surrounding wetlands through measures to begin to reverse wetland losses in areas affected by navigation, oil and gas, and other channels and through modification of the Caernarvon Freshwater Diversion structure"; (2) stated that "at least $495,300,000 shall be used consistent with the cost-sharing provisions under which the projects were originally constructed to raise levee heights where necessary and otherwise enhance"

---

[31] R. Doc. No. 24-1, at 18.

[32] *See, e.g.*, R. Doc. No. 24-1, at 24 ("Recognizing that the [4th Supplemental] is ambiguous on restoration costs, the Corps looked to other statutory provisions that address cost-sharing for restoration projects to discern Congress's intent."); *see also* 33 U.S.C. § 2218 ("Unless otherwise specified, the cost sharing provisions of this subchapter shall apply to all projects in this Act.").

certain existing projects to increase flood protection; and (3) allocated certain funds for three projects in other states.

A comparison of the language used in WRDA 2007 and the 4th Supplemental yields an unambiguous answer as to Congress's intent with respect to cost sharing. The Corps' plan "to close [MRGO] and *restore* and protect the ecosystem," WRDA 2007 § 7013(a)(4) (emphasis added), which includes "a plan to physically modify [MRGO] and *restore* the areas affected by the *navigation channel*" as well as "a plan to *restore* natural features of the ecosystem that will *reduce* or prevent *damage from storm surge*," *id.* § 7013(a)(3)(B)(i)-(ii) (emphasis added), mimics the language of the 4th Supplemental, which provides for "*reduc[ing] the risk of storm damage* to the greater New Orleans metropolitan area, at full Federal expense, by *restoring* the surrounding wetlands through measures to begin to reverse wetland losses in areas affected by *navigation*, oil and gas, and other *channels*," 4th Supplemental, tit. II, ch. 3 (emphasis added). The project authorized by § 7013 has nothing to do with raising levee heights or the other projects listed in the "Construction" category in the 4th Supplemental. Accordingly, there can only be one reasonable interpretation of Congress's intent with respect to cost sharing: the project authorized by § 7013 must be done "at full Federal expense." 4th Supplemental, tit. II, ch. 3. "[T]hat is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington*, 133 S. Ct. at 1868.

This reading of the text itself is further bolstered by a consideration of the statute's legislative history and purpose. In President Bush's veto statement, he described "hurricane protection for greater New Orleans" as one of "the Nation's critical water resources needs." 2007 WL 3231250. This sentiment was repeatedly echoed by the remarks of the Representatives and Senators who voted to override that veto. *See, e.g.*, Water Resources Development Act of

16

2007—Veto, 153 Cong. Rec. S14113-02, 2007 WL 3307877 (Nov. 8, 2007) (Senate debate regarding President Bush's veto statement); Water Resources Development Act of 2007—Veto Message from the President of the United States, 153 Cong. Rec. H12788-02, 2007 WL 3276604 (Nov. 6, 2007) (House debate regarding President Bush's veto statement); *see also, e.g.*, Water Resources Development Act of 2007—Conference Report, 153 Cong. Rec. S11974-02, 2007 WL 2767477 (Sept. 24, 2007) (Senate debate regarding the conference report); Conference Report on H.R. 1495, Water Resources Development Act of 2007, 153 Cong. Rec. H9522-01, 2007 WL 2214160 (Aug. 1, 2007) (House debate regarding the conference report).

Defendants have not identified a single statement by any legislator, or any other item within the legislative history, that supports their interpretation, and the Court's own review of the applicable portions of the Congressional Record revealed nothing to suggest that Congress intended Louisiana to pay for any part of the MRGO closure and ecosystem restoration project authorized by § 7013. To the contrary, there is only one statement regarding § 7012(b), the cost-sharing provision, in the Congressional Record which has been identified by the parties or uncovered by this Court. U.S. Senator David Vitter, who served on the conference committee that reconciled the House and Senate versions of WRDA 2007, stated that "[s]ection 7012(b) clarifies that all work authorized pursuant to sections 7012(a)(2) through 7012(a)(9) and [s]ection 7013 shall be performed at full Federal expense." Water Resources Development Act of 2007, 153 Cong. Rec. S12769-01, 2007 WL 2891222 (Oct. 4, 2007) (statement of Senator Vitter).

There is nothing that requires Congress to legislate using the clearest possible language, and although the benefit of hindsight often reveals that legislation could have been more precisely worded, such retrospection does not inject ambiguity into a statute that contains none.

Considering the extensive legislative history behind WRDA 2007, the context provided by the 3rd and 4th Supplementals, which funneled billions of dollars to the Gulf Coast region for hurricane damage remediation and ecosystem restoration, and the clear purpose of § 7013 to undo the damage that had been done by MRGO, the Court interprets WRDA 2007 as providing for the MRGO closure and ecosystem restoration project at full federal expense.

Defendants assert that Congress could not have intended that the MRGO closure and ecosystem restoration project be funded at full federal expense because "Congress used the word 'cost-sharing' not once, but twice."[33] According to defendants, "Congress said: 'COST-SHARING.—Activities authorized by . . . section 7013 shall be carried out in a manner that is consistent with the cost-sharing requirements specified in the [Emergency Appropriations Act].' WRDA 2007, Section 7012(b), 121 Stat. 1280."[34] However, defendants' alteration of § 7012(b)'s text is significant because it omits the fact that the provision applies to "[a]ctivities authorized by subsection (a) *and* section 7013." (emphasis added). Mere use of the term "cost sharing" says nothing about the actual details of the cost-sharing arrangement for any project to which § 7012(b) applies—for the specifics of the cost-sharing arrangement applicable to each project, one must refer to the 4th Supplemental which, for example, requires non-Federal interests to pay all ongoing maintenance costs for the projects listed in § 7012(a), as explained above. Moreover, defendants offer no justification for their decision to emphasize and ascribe meaning to the use of the term "COST SHARING" in § 7012(b), while simultaneously ignoring the use of the word "CONSTRUCTION" in § 7013(a)(4); indeed, they make no attempt to explain the significance of Congress's characterization of the § 7013 project. Defendant's myopic, outsized emphasis on the use of the term "cost sharing," without consideration of its

---

[33] R. Doc. No. 37, at 3.
[34] R. Doc. No. 37, at 3 (alterations and error in original).

context or the numerous projects to which § 7012(b) applies, cannot support their interpretation of the statute.

Defendants further argue that because WRDA 2007 § 7012(b) "did not explicitly or implicitly repeal" the generally applicable cost-sharing statute, 33 U.S.C. § 2213, such statute must apply to the MRGO closure and ecosystem restoration project because "'[m]ere appropriations acts . . . do not make changes in substantive law unless they do so explicitly.'"[35] However, defendants ignore the fact that the generally applicable cost-sharing rules only apply "[u]nless otherwise specified." 33 U.S.C. § 2218. As explained above, Congress "otherwise specified" that the MRGO closure and ecosystem restoration project should be funded at full federal expense when it enacted WRDA 2007 § 7012(b) and the 4th Supplemental.

Even assuming that WRDA 2007 § 7012(b) is ambiguous—a finding which this Court does not make—defendants would fail at *Chevron* step two because theirs is *not* a permissible construction of the statute. *See Mortera-Cruz*, 409 F.3d at 253. "[S]tep two of *Chevron* requires us to evaluate the same data that we also evaluate under *Chevron* step one, but using different criteria. Under step one we consider text, history, and purpose to determine whether these convey a plain meaning that *requires* a certain interpretation; under step two we consider text, history, and purpose to determine whether these *permit* the interpretation chosen by the agency." *Bell Atl. Tel. Cos.*, 131 F.3d at 1049; *see also Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 893 (D.C. Cir. 1996) ("This second inquiry is thus not independent of the first: what a court may consider a reasonable interpretation largely depends on the nature and extent of the ambiguity already identified in *Chevron*'s first step."). "[A]n agency cannot exploit some minor unclarity to put forth a reading that diverges from any realistic meaning of the statute lest the

---

[35] R. Doc. No. 24-1, at 20 (quoting *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 813 (D.C. Cir. 1998)); R. Doc. No. 24-1, at 24.

agency's action be held unreasonable." *Massachusetts*, 93 F.3d at 893. Considering the text, legislative history, and purpose of WRDA 2007 §§ 7012(b) and 7013, for the reasons outlined above, the only reasonable interpretation of Congress's intent is that the MRGO closure and ecosystem restoration project shall be implemented at full federal expense.

## CONCLUSION

Ten years after Hurricane Katrina, vital ecosystem restoration remains incomplete. Rather than abide by the clear intent of Congress and begin the immediate implementation of a plan to restore that which the Corps helped destroy, defendants arbitrarily and capriciously misconstrued their clear mandate to restore an ecosystem ravaged by MRGO. Defendants would require the State of Louisiana to pay over a third of the cost of repairing the ecosystem damage that MRGO has inflicted, having not even attempted to obtain funding for the full cost of the project through the appropriations process.[36] Congress's unambiguously expressed intent does not require the State of Louisiana to pay for the shortcomings of the U.S. Army Corps of Engineers.

Unfortunately, coastal restoration necessitated by MRGO remains stalled while the legal wrangling continues. Due to its arbitrary and capricious action, the Corps has compounded the problems that MRGO caused. The legal issues resolved by this Court will be reviewed and, if this Court's reasoning is incorrect, the State of Louisiana may be forced to decide whether it will spend close to a billion dollars to repair the damage that resulted from a project designed and constructed not by the State of Louisiana, but by the federal government.

For the foregoing reasons,

**IT IS ORDERED** that plaintiff's motion for summary judgment is **GRANTED**, and that defendants' motion for summary judgment is **DENIED**.

---

[36] *See* supra note 4.

**IT IS FURTHER ORDERED** that defendants' decision to require plaintiff to provide any funding toward the MRGO closure and ecosystem restoration project is **VACATED** because such decision was arbitrary and capricious and not in accordance with the law, and the issue is **REMANDED** to the Corps for further proceedings consistent with this opinion.

New Orleans, Louisiana, August 27, 2015.

LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE